

# The Commonwealth of Massachusetts

Executive Office of Health and Human Services
## Department of Youth Services
27 Wormwood Street, Suite 400
Boston, MA 02210-1613

617.727.7575
FAX#: 617.951.2409

**MITT ROMNEY**
GOVERNOR

**KERRY HEALEY**
LIEUTENANT GOVERNOR

**RONALD PRESTON**
SECRETARY

**MICHAEL C. BOLDEN**
COMMISSIONER

July 7, 2004

Michael A. Subenko
W-65867
M.C.I. Norfolk, STAU, Cell 332
P.O. Box 43, 2 Clark Street
Norfolk, MA 02056-0043

Re: Request for Records

Dear Ms. Subenko:

Pursuant to your request of January 9, 2004 pleased find enclosed all records and documents generated during your commitment. I apologize for the delay, the field office had a tough time locating your file.

Should you have any questions, please feel free to contact this office.

Sincerely,

Stephanie K. Finley
Keeper of Records



# The Commonwealth of Massachusetts

Executive Office of Health and Human Services
## Department of Youth Services
27 Wormwood Street, Suite 400
Boston, MA 02210-1613

**MITT ROMNEY**
*GOVERNOR*

*KERRY HEALEY*
LIEUTENANT GOVERNOR

*RONALD PRESTON*
SECRETARY

*MICHAEL C. BOLDEN*
COMMISSIONER

617.727.7575
FAX#: 617.951.2409

SCANNED

DATE: 08/03/04

BY: SKY

I, Stephanie K. Finley, Keeper of the Records for the Department of Youth Services, say as follows under the pains and penalties of perjury:

### CERTIFICATION OF RECORDS

This is to certify that the attached information is a true and complete copy of the record of _____, DOB _____, in the possession and control of the Department of Youth Services.

Signed under the pains and penalties of perjury this ____ day of _____, 2004.

Stephanie K. Finley
Keeper of the Records

Phaneuf Center
104 MARKET ST.
BROCKTON, MA 02401

## **MONTHLY REPORT**

<u>Resident</u>: Michael Subenko
<u>Date of Birth</u>: October 27, 1978
<u>Date of Entry</u>: 8/12/94
<u>Counselor</u>: Graylynn A Brezzel
<u>DYS Caseworker</u>: Mike Larkin
<u>Date</u>: August 31, 1994

<u>Individual Sessions (2 hours per week)</u>: August 14,24,30
Michael and myself have met several times to discuss his behavior. It appears that he is easily influenced by negativity. He has had several verbal confrontations with other residents over things such as basketball games and pool games . I have talked to him about not listening to or feeding into negative people's behavior.

<u>Groups (1.5 hours each)</u>:
Daily grounding meetings are held three times per day to discuss issues that have arisen during the day and implement strategies for resolution. Therapy groups are held two times per week and are led by the program director and clinical director. These groups focus on issues related to resident's offender behavior patterns: anger, making poor choices, depression , low self esteem, peer interactions and difficulty with authority, Michael does well in groups. He's very open and actively participates in discussions.

<u>Narcotics Anonymous/Alcoholics Anonymous</u>:
NA/AA meetings are held at Phaneuf on Wednesdays. Substance abuse therapy groups are held bi-weekly on Thursdays. The focus of these groups is on increasing residents' understanding of the part substance abuse contributes to their offender behavior patterns and conflictual relationships with peers, parents and authority figures. All residents are required to attend.

<u>Incidents and/or Court Involvements</u>:none

<u>Medical Issues:</u>  none

<u>Expected Date of Graduation:</u>    November 12, 1994

<u>Aftercare Plan:</u>  To return to home of parents and  to his community.



Phaneuf Center
104 MARKET ST.
BROCKTON, MA. 02401

<u>Resident:</u>  Michael Subenko
<u>Date of Birth:</u>  2/10/78
<u>Date of Entry:</u>  8/12/94
<u>Phaneuf Counselor:</u>  Graylynn A. Brezzel
<u>DYS Caseworker:</u>  Mike Larkin, Southeast Region
<u>Date:</u>  September 30, 1994

<u>Individual Sessions (1.5 hours per week minimum):</u> September 7, 14, 21, 28
Mike and I have met on several occasions during the month of September to discuss issues that have occurred during his stay at Phaneuf. Mike has a bad habit of truing to impress or show off in front of several residents by trying to bully other residents. Some examples of this behavior include trying to take another resident's pool game, playing very aggressive basketball with the intention of intimidating other residents, swearing at other residents and/or arguing while walking towards them. He has been told by staff and myself that he needs to stop trying to impress other residents due to peer pressure and concentrate more on his behavior.

<u>Groups (1.5 hours each):</u>
Daily grounding meetings are held three times per day to discuss issues that have arisen during the day and implement strategies for resolution. Therapy groups are held two times per week and are led by the Program Director and the Clinical Director. These groups focus on issues related to residents' offender behavior patterns: anger, making poor choices, depression, low self-esteem, peer interactions and difficulty with authority. Levels group is held weekly on Fridays. Residents present to staff and other residents the reasons they believe they should progress to the next Level. They receive feedback on their behavior and participation in the treatment program. Mike attends all groups although his participation is minimal.

<u>Narcotics Anonymous/Alcoholics Anonymous:</u>
NA/AA meetings are held at Phaneuf on Wednesdays. Substance abuse therapy groups are held bi-weekly on Thursdays. The focus of these groups is on increasing residents' awareness of the part substance abuse contributes to their offender behavior pattern and conflictual relationships with peers, parents and authority figures. All residents are required to attend.

<u>Incidents and/or Court Involvements:</u>
Mike has received several consequences for inappropriate behavior.

<u>Medical Issues:</u>  None.

Phaneuf Center
104 MARKET ST.
BROCKTON, MA 02401

**MONTHLY REPORT**

Resident: Michael Subenko
Date of Birth: October 2, 1978
Date of Entry: 8/12/94
Counselor: Graylynn A Brezzel
DYS Caseworker: Mike Larkin-Southeast Region
Date: October 31, 1994

Individual Sessions (2 hours per week):    October 2,9,15,22,29,30
Michael and I have met weekly to discuss issues related to his interactions with peers, accepting responsibility for his behavior and dealing constructively with anger. As of late, Michael has been more compliant with the rules and regulations of the program. Michael is talking more about his anger, I told him that the best thing I can recommend is the S.T.A.R. treatment: (stop, think, act & review) and it has been working.

Groups (1.5 hours each):
Daily grounding meetings are held three times per day to discuss issues that have arisen during the day and implement strategies for resolution. Therapy groups are held two times per week and are led by the Program Director and Clinical Director. These groups focus on issues related to residents' offender behavior patterns: anger, making poor choices, depression, low self-esteem, peer interactions and difficulty with authority.
Levels group is held weekly on Fridays. Residents present to staff and other residents the reasons they believe they should progress to the next level. They receive feedback on their behavior and participation in the treatment program.
Michael is attentive in groups but his active participation is limited. When he has shared in groups, he tends to present himself as the innocent victim. However, he is able to accept constructive criticism from the group members.

Narcotics Anonymous/Alcoholics Anonymous:
NA/AA meetings are held on Wednesdays. Substance abuse therapy groups are held bi-weekly on Thursdays. The focus of these groups is on increasing residents' understanding of the part substance abuse contributes to their offender behavior patterns and conflictual relationships with peers, parents and authority figures.

# PHANEUF YOUTH CENTER
104 Market Street, Brockton, MA 02401 • (508) 584-0500

## FAMILY COMPONENT

RESIDENT: Michael Subenko
DATE OF ENTRY: 8/12/94
CASEWORKER: Mike Larkin
REGION: Southeastern
FAMILY WORKER: Jeanne Crespi, M.S.W.
DATE: October 1994

During the month of October, Michael has addressed his processing feelings such as anger, sadness, and frustration for the first time, he states, in several years. He has looked at past attempts to avoid such processing through substances and offender behaviors. Also, Michael contends that he avoided communication of such feelings with family members in efforts to evade any family conflicts and to "keep the family together". He continues to address the role of his acting out behaviors both in the program and at home and attempts to process his feelings verbally. He acknowledges the gains made with his relationship with his mother as a result of his communication of feelings. Michael continues to struggle with accepting some of his mother's rules and expectations; particularly with school attendance.

Michael attends family group weekly. He maintains communication with his mother via telephone, family sessions, and weekend visitation.

Jeanne M. Crespi, M.S.W.
Family Worker

Galleen Stone, L.I.C.S.W.
Program Director

CC: File

*bring it all together*

# PHANEUF YOUTH CENTER
104 Market Street, Brockton, MA 02401 • (508) 584-0500

## MONTHLY REPORT- FAMILY COMPONENT

Jeanne Crespi; MSW

<u>Resident:</u>  Michael Subenko
<u>Date of Birth:</u>  10/2/78
<u>Date of Entry:</u>  8/12/94
<u>Caseworker:</u>  Mike Larkin

<u>Family Sessions:</u>
   Since the inception of the family component in September, 1994, Michael has addressed his family history and its impact on his behaviors. In particular, he has looked at the role of his father in his life and effects of his departure. Both he and his mother have addressed relevant family history in effort to promote clarification and understanding that was previously misunderstood by Michael.

<u>Family Group:</u>
In family group, Michael has addressed the role of his father in his life. Also, Michael has begun to identify personal family goals prior to his impeding reunification. Lastly, Michael has looked at the impact of his offender behaviors to individual family members and the system as a whole.

<u>Family Contact:</u>
Michael has maintained consistent contact with his mother, Beverly Sebenko, through telephone contact and weekend visits.. Also, his mother visited the program on 9/28/94 for his initial family session.

_____
Jeanne Crespi MSW
Family Worker

*bring it all together*

**Incidents and/or Court Involvements:**
10/11 writing assignment for talking in class
10/21 detention/makeup class work for refusing to do work in school.


**Medical Issues:**
None

**Expected Date of Graduation:** December 12, 1994

**Aftercare Plan:** To return to home of parent (s) and re-enroll in school.


**Summary:** Michael has been working hard this month to address issues related to his tendency to engage in horseplay, be influenced in a negative way by peers and deny responsibility for his behavior. He continues to struggle with these issues but has shown progress. As he has become more serious about his treatment, we have seen an increase in his bouts of sadness and anger which he is beginning to discuss more openly. Mike seems to now realize that he has some serious issues he needs to begin addressing prior to re-entering the community in order not to repeat past mistakes and is making a real effort.


_Toni Lewis, LICSW_
Toni Lewis MSW, LICSW
Clinical Director


_Galen Stone, LICSW_
Galen Stone MSW, LICSW
Program Director

<u>Summary:</u>  Michael Subenko has done well in the program since his admission on 8/12/94. He has, at times, been a target for some residents' negative behavior but has been able to control his anger so that the situations don't deteriorate into physical confrontations. Although an active participant in group discussions, he often appears to have difficulty processing information and focusing on subjects. Mike Subenko progressed to level 1 on 8/19/94. If his progress continues at the same pace, he should have no difficulty successfully completing the treatment program.

Toni Lewis MSW, LICSW
Clinical Director

Galen Stone MSW, LICSW
Program Director

19

1   happen.  Number (2) the fact that despite a serious
2   collision and his own car being -- his own -- not his
3   own car, actually, but somebody else's Volvo being
4   deactivated, he was nonetheless successful in escaping
5   the police no doubt was a fact in his mind that
6   encouraged him to keep going two months later, no matter
7   what, because he had beaten them before, let's beat them
8   again.
9          There is a real sort of Bonnie and Clyde
10  aspect of running to this defendant, Judge, and that
11  state of mind is highly relevant because it is his state
12  of mind by which this jury must judge him, not only what
13  a reasonable man would know and appreciate, but
14  specifically subjectively under Welansky what this
15  defendant would know.  And for him to be portrayed
16  before the jury as a young, scared kid who just turned
17  18 the week before, who maybe just got a little
18  overwhelmed and did something foolish is not this
19  defendant.  It would mislead the jury as to his specific
20  knowledge on this date at that place and time as to what
21  the consequences might well be and what the consequences
22  in fact were.  And that is why the Commonwealth suggests
23  that for Officer Robert Gervasi of the Weymouth Police
24  to testify to recognizing the defendant, pursuing him,

58

1       MS. WILLIAMS: I would say --

2       THE COURT: Especially if it violated any --
3  any policy rules that they had or procedure rules on
4  pursuits?

5       MS. WILLIAMS: I would suggest not -- and let
6  me add, by the way, that the Commonwealth's evidence
7  overwhelmingly suggests that this is utter nonsense,
8  that the push -- that there were, in fact, State Police
9  push marks on the rear of the Mercedes bumper consistent
10 with State Police front bumpers push bars, but they were
11 not seen until days after this event when this Mercedes
12 had been pushed and shoved to a number of different --
13 you know, a tow area and then the Norwell barracks and
14 all that stuff. And also as a matter of physics and
15  mathematics, it could not have happened. As a matter of
16 common sense, it could not have happened, but I'll save
17 that for the jury. So, I'm not in any way conceding
18 this argument.

19      What I'm trying to show is this: The law says
20 that where a defendant sets in motion a chain of events
21 he is responsible -- under Commonwealth versus Berggren
22 398 Mass. 338 1986, he is responsible for reasonably
23 foreseeable consequences.

24      THE COURT: Yes, I understand that, and the

```
                                                              9
1              MR. MONDANO:  I have added him to my list.
2              THE COURT:  You do have him on your list?
3              MR. MONDANO:  Yes, sir.
4              MS. WILLIAMS:  No.  No, he's not on mine.
5              THE COURT:  No, he isn't.
6              MS. WILLIAMS:  But -- so -- I mean I really --
7    I thought he was.  I really don't plan to call him, but
8    he's out there as somebody potential whose name will be
9    read just from the defendant's list.  So, I would like
10   him to at least have the ability to come in the
11   courtroom if he needs to.  And the other exception
12   really relates to my motion for disclosure of the
13   defense expert.  I would like the Commonwealth's expert,
14   Trooper Donald Place, who will have testified by that
15   time, to be present in the courtroom when the defense
16   presents its expert in the event I may need Trooper
17   Place to testify in rebuttal, because I am not an
18   accident reconstruction person.  Because I don't know       ☆
19   the mathematical formulas and all that, it's a lot
20   easier to have him --
21             THE COURT:  All right.
22             MS. WILLIAMS:  -- here to listen to that.
23             THE COURT:  Let's take them one at a time, Ms.
24   Williams, if we may.  The first individual, the case
```

                                                                56

1   death of Mary Anderson and the injury to the others, it
2   may be that whether they violated any internal
3   procedures would be relevant to a civil issue where
4   their conduct was the determining and the pivotal fact
5   in the case.
6            Here, we have a very interesting issue, Judge.
7   Now, let me start out by saying I don't know whether the
8   police violated any chase procedure, and quite frankly,
9   before we get into a maelstrom of that evidence in front
10  of the jury, I think the defendant should be required to
11  cite chapter and verse of where he says the police
12  violated internal procedure, because otherwise all it's
13  doing is brewing up a hornet's nest that doesn't get the
14  defendant anywhere.
15           Let me talk for a moment about the issue --
16  the legal issues here because -- as to why the police
17  conduct should be relevant.  It has to do with
18  causation.  Because let us suppose for a minute that the
19  police did in fact hit this defendant five times from
20  behind and cause him to spin out of control, suppose for
21  a moment that that was the evidence.  What legal good
22  does it do to the defendant --
23           THE COURT OFFICER:  Sh.  Gentlemen, please.
24           MS. WILLIAMS:  What benefit -- where does it

Volvo went about twenty five yards and "died" because it was disabled from the crash. Tr. 4: 200.

2. <u>The Defendant's Case</u>.

The defendant did not testify. He claimed the prosecution of the defendant was motivated to vindicate the wrongful actions of the police. Tr. 5: 60. He pointed out that the officers involved had lawyers come to the scene and did not cooperate with the accident reconstructionist. Tr. 5: 59. (The State Police accident reconstructionist testified that he relied on objective scientific evidence gleaned from the roadway in making his determinations, tr. 4: 130-131).

The defendant emphasized evidence tending to show that the defendant drove about sixty miles per hour, including a citation for speeding written at that number. Tr. 5: 56, 65. He argued that he was only eighteen years old at the time, tr. 5: 55, and that speed of sixty miles per hour was consistent with a conviction for motor vehicle homicide, not manslaughter. Tr. 5: 65.

ARGUMENT

I. THE CHARGE OF A MOTOR VEHICLE HOMICIDE WAS FILED WITH THE DEFENDANT'S ASSENT AND IS NOT BEFORE THE COURT ON APPEAL.

The defendant's conviction for motor vehicle homicide was placed on file with his assent. "A

9

1    MR. MONDANO: That's correct. If you'll
2  remember, Your Honor, Trooper Doran gets into this
3  elaborate description of the information that he gives to
4  Sergeant Place. Sergeant Place never talked to the man.
5  A raw fabrication. So the issue here is credibility.
6    MS. WILLIAMS: The fact of complete
7  evidence as to that ---
8    THE COURT: All right. All right. Now,
9  look, either you stipulate to the fact that two witnesses
10 and only two witnesses were before the Grand Jury and
11 that you were the DA who presented the case to the Grand
12 Jury, or we'll re-open the evidence and put you on the
13 witness stand and establish those two things.
14   MS. WILLIAMS: Then I will stipulate to
15 that.
16   THE COURT: All right.
17   MR. MONDANO: Exactly how you said it is
18 fine for me. Your Honor.
19   MS. WILLIAMS: I ask though if you will
20 instruct -- this is what I would request: The Grand Jury
21 hears evidence to establish probable cause to believe a
22 crime has been committed. And Ms. Williams called two
23 witnesses, Trooper Paul L'Itaulien, the case officer, and
24 Sergeant Donald Place, the accident or collision

135

lose one over the weekend, we would have taken the verdict and it is sealed. And then on Monday morning if there are only eleven jurors, that verdict isn't any good because we don't have twelve jurors who agree on the verdict.

Now, if we took the verdict, for example, of whatever, if we lose a couple of them, we would have a mistrial on Monday morning because we don't have a jury of twelve. On the other hand, if it's sealed, we have a verdict.

MS. WILLIAMS: I guess the fact that we have one stray juror left leaves me with the feeling that we have this insurance. I think it would be a disaster. The Commonwealth would prefer to take the verdicts when the jury is ready.

THE COURT: What do you say?

MR. MONDANO: I share that position. The prospect that you are describing is truly horrific.

MS. WILLIAMS: Believe me, nobody wants to try this case again.

THE COURT: Absolutely not.

MR. MONDANO: My feeling is to ask them if they have reached a verdict and if there's been sort of a straw vote, a preliminary vote.

56

1  in?
2     A. Several.
3     Q. Are any of those depicted on the diagram?
4     A. No.
5     Q. Do you know where they took place?
6     A. Several between the two entrances.
7     Q. So all of your calculations with respect to the
8  roadway and its condition vis-a-vis wet or dry took place
9  between the two openings of the parking lot of the
10 Plymouth Quarry, correct?
11    A. Including the area where the Sundance ended up.
12 Including that area, that's roughly the area.
13    Q. Okay. From the beginning of the openings?
14    A. Yes.
15    Q. To include the widest of the openings?
16    A. Yes.
17    Q. All right. Now, did you assign a range on the
18 friction values?
19    A. No.
20    Q. Did you take a mean of the readings that you got
21 when you ran the sled or after?
22    A. All my sled pulls were the same.
23    Q. All your sled pulls were the same?
24    A. That's correct.

57

Q. And was the road wet when you pulled it?

A. I wouldn't classify it as wet. I would classify it as spotty, drying. It was in the process of drying. I would not give it a wet characteristic.

Q. So you made adjustments?

A. Yes, I did.

Q. And the adjustment was an adjustment you made based on probably wetter so I will adjust my ---

A. The adjustment was made to be fair to all the parties in the collision. If I used a friction value that was too high, the speeds would be increased. So I reduced the friction value to a value that I felt comfortable with on the possibility that it was wetter and that played a significant role in this so I reduced it by .05.

Q. I understand but the question I was asking you is that, in other words, when you made the determination, you made the adjustment, was this just like some kind of assignment to a formula which facilitates a determination of what would be an appropriate adjustment or is this where your expertise comes in?

A. Well, I adjusted it based on my expertise, my experience.

Q. Sir, there were, you say, 40 feet of skid marks?