62

Q. It's fair to say that you didn't have a lot of evidence for this accident reconstruction, is that fair to say?

A. I'm sorry. Could you ask the question again, please?

Q. You didn't have a lot of evidence for this accident reconstruction?

A. I didn't have all the evidence. I certainly had some evidence.

Q. The question is, you didn't have a lot of evidence?

A. I had quite a bit of evidence.

Q. And when you told the Grand Jury in response to a question, that you didn't have a lot of evidence, you meant something other than what we're talking about here today?

A. That was a poor choice of words at the Grand Jury. Certainly I had a lot of evidence. I didn't have all the evidence.

Q. So in other words, this statement in here, "So to resurrect speeds involved with these vehicles in the collision, I had to use some estimates. And the reason for that was because I didn't have a lot of evidence." That's what you told the Grand Jury?

70

1   A. He might be.

2   Q. Why only might?

3   A. It depends on his position. It depends on what
4   he remembers.

5   Q. You don't know what he remembers?

6   A. No.

7   Q. So then I put my hypothetical to you. If he was
8   right behind him, he would be a pretty good witness?

9   A. Sure.

10  Q. And you have some evidence that he was right
11  behind him?

12  A. I had no evidence, specific evidence, that he
13  was right behind him.

14  Q. You were aware of no witness statement that
15  describes Trooper Doran's cruiser being directly behind?

16  A. Evidence or a statement are two different
17  things.

18  Q. Oh, really?

19  A. Yes.

20  Q. So when Ms. Ring spoke with you, was that
21  evidence or a statement?

22  A. That was a statement.

23  Q. So to the extent that you're relying on it here,
24  it's not really evidence, it's just a statement?

71

A. No, it's certainly evidence that I utilized.

Q. So there was some other evidence that you didn't utilize, right?

A. There is some evidence I did not utilize when calculating speeds at impact.

Q. And there is also some evidence you did not utilize in terms of assessing Trooper Doran's utility to you as a prospective source of information, right?

A. Pertaining to the speed of the Mercedes at the time?

Q. Sure. You've got the guy's name here on this big board, a guy by the name of Gargano?

A. Correct.

Q. An elevated view, looking down to the broad panorama of this roadway, sees the cruiser within a foot of the rear end of the Mercedes.

A. Correct.

Q. Now, you did some more calculations in court discounting some aspects of what he had to say, correct?

A. I took Mr. Gargano's statement as I took any other statement. I simply recorded what they had to say and that was their perception of the accident.

Q. But that still isn't the question I'm asking.

A. I don't understand.

74

1  Q. Well, Mr. Pimental is your best witness, isn't
2  he?
3  A. Mr. Pimental might have been suggested in my
4  report as a best witness but I did not interview him.
5  Q. And based on what you know Mr. Pimental said, he
6  saw a cruiser -- sometime after the Mercedes went by, a
7  cruiser went by?
8  A. Yes.
9  Q. So we know that there's two people that see the
10 cruiser behind the Mercedes?
11 A. There were several people that saw the cruiser
12 behind the Mercedes.
13 Q. There seems to be a consensus emerging here that
14 there was a cruiser behind the Mercedes?
15 A. Absolutely.
16 Q. And also I think there's a concession here that
17 that was Trooper Doran, correct?
18 A. Right.
19 Q. And that he was behind the Mercedes as it came
20 down Route 53?
21 A. Sure.
22 Q. Not a good witness for speed? Why wasn't he a
23 good witness for the speed of the Mercedes?
24 A. My function as a ---

75

1  Q. No. Why was he not a good witness for the speed
2  of the Mercedes?
3  A. If I could answer that question, I'll answer
4  that.
5  Q. No, the question I'm asking, not some other
6  question. Why was he not a good witness for the speed of
7  the Mercedes?
8  A. Because I do not know the exact position of his
9  vehicle at the time of the collision. All I know is that
10 it was behind the Mercedes at the time.
11 Q. Well, sir, that's my question. Had you spoken
12 to him about it, had you been able to discuss it with
13 him, it could have been very revealing with respect to
14 what transpired out there that day. Fair statement?
15 A. It would have been a number assigned for the
16 Mercedes that was given by an eyewitness.
17 Q. And not just any kind of eyewitness?
18 A. Not while I was sent to the scene.
19 Q. Sir, you're still not answering the question.
20 Why wouldn't he be a good eyewitness here? Why?
21 A. He could tell me whatever he wanted to tell me.
22 That's not what I was looking for.
23 Q. I see. So there's no sense talking to a guy
24 like him. He might have made up a story.

1  A.  He's going to give me a speed estimate based on all the other witnesses who give the same thing, ranging from 60 to 100 miles per hour.

4  Q.  You mean you didn't consider what Trooper Doran had to say because you were afraid that Trooper Doran was just going to toss another number in among other numbers?

7  A.  That's not what I relied on for my calculations.

8  Q.  Now, wait. I have to ask you to stick with the question. Are you saying that you didn't care what Doran had to say because all he would have been in connection with your investigation was a number among numbers?

12  A.  Correct.

13  Q.  Now, was any aspect of your calculation affected by a conclusion that the Mercedes never applied its brakes?

16  A.  If there was evidence that the Mercedes braked prior to the collision, that certainly would have been considered in the speed analysis.

19  Q.  Have you heard any evidence in this case about the Mercedes braking as it was moving along Route 53 prior to this accident?

22  A.  No.

23  Q.  If I were to suggest to you, sir. that we heard yesterday from Trooper Doran on the stand that the

1  on his own behalf.  If any of you do not understand
2  these important rights, please hold up your card.  Okay.
3  I see no hand raised.  Thank you.
4       If anyone would have any difficulty accepting
5  these propositions of law apply in this case, please
6  hold up your card.  Again I see no hand raised.  Thank
7  you.
8       Next question:  Would the fact that the
9  defendant was arrested in this case interfere with your
10 ability to presume his innocence?  If so, please hold up
11 your card.  I see no hand raised.  Thank you.
12      Next question:  Do any of you feel that the
13 defendant is probably guilty merely because he's been
14 charged with a crime or crimes in this case?  If so,
15 please hold up your card.  I see no hand raised.  Thank
16 you.
17      Next question:  If you or any member of your
18 immediate family or a close personal friend has ever
19 been the victim of a crime or a defendant in a criminal
20 case, would this fact interfere with your ability to
21 decide this case fairly and impartially based on the
22 evidence introduced at trial?  If so, please hold up
23 your card.  A couple of folks.
24      THE COURT OFFICERS:  Panel 5, seat 7.  Panel

```
 1    removed from the scene?
 2         A.   Ambulance, paramedics came.
 3         Q.   Help came to the scene and they were
 4    transported?
 5         A.   Yes.
 6         Q.   To various hospitals?
 7         A.   Yes.
 8         Q.   They had life-threatening injuries?
 9         A.   Yes.
10         Q.   What was the speed of the column of traffic that
11    you were behind on Route 53?
12         A.   Approximate speed, 50.
13         Q.   And you don't recall seeing a single car moving
14    in the opposite direction throughout the course of your
15    pursuit of the defendant on Route 53?
16         A.   No, I don't recall.
17         Q.   Sir, from the time you turned on your emergency
18    equipment on Route 3 to the time of this accident, about
19    45 minutes, was it not?
20         A.   I believe approximately that.
21         Q.   Do you know who arrested the defendant?
22              MS. WILLIAMS:  Asked and answered.
23              THE COURT:  Not by him.
24         A.   I don't know.
```

1   Q. Do you remember who arrested the defendant?
2   A. I believe Craven.
3   Q. Craven?
4   A. Sergeant Craven, I believe, arrested him.
5   Q. Do you recall who after you and Sergeant Craven
6   were the next responding State Police units to the scene?
7   A. No, I don't recall who showed up next.
8   Q. Do you recall how much later than your arrival
9   on the scene the stretcher showed up?
10  A. I can't recall exactly the time, no.
11  Q. Do you recall how much later at the scene before
12  your lawyer showed up?
13          MS. WILLIAMS: Objection. Relevance.
14          THE COURT: No, I will allow that.
15  A. I don't recall exactly, no.
16  Q. Do you know who called for your lawyer?
17  A. No, I don't recall.
18  Q. Did you, sir, as a result of your advise from
19  counsel decline to speak with Sergeant Place during the
20  course of the accident reconstruction investigation he
21  conducted for the State Police?
22  A. I was never asked by Trooper Place personally.
23  Q. Sergeant Place never asked you any questions
24  about his investigation into the incident?

Cravan

25

memory with respect to what was the range of speed attributed to the Mercedes while it was on Route 3?

A. Refresh my memory? No, sir. According to that it's 70, 75.

Q. Sir, technically speaking, you were the arresting officer on Route 53 at the conclusion of the pursuit?

A. Actually, I believe it was Sergeant Eiseman, I believe, because I was involved in the incident and they removed that from me.

Q. Well, did you prepare a report of investigation in connection with this case relative to Michael Subenko?

A. Yes, sir.

Q. Incidentally, did you write any citations to the defendant in connection with this episode?

A. I don't recall, no, sir.

Q. Do you know if anybody else wrote any citations from the State Police in connection with the episode starting on Route 3 and ending on Route 53?

A. I don't know that, sir.

Q. You don't know if he was cited for speeding by anybody, do you?

A. I don't know that.

Q. In the filling out of the record of

175

1  Were citations issued?  Craven said no.  And Doran said
2  Craven issued something.
3             MS. WILLIAMS:  Creates a misapprehension
4  of the jury that ---
5             MR. MONDANO:  This doesn't speak to the
6  issue created by that testimony.
7             THE COURT:  All right.  I'll allow it.
8  Bring the jury out, please.
9             (Jury present in the courtroom).
10            THE COURT:  Good afternoon, everyone.
11 Call your next witness, please.
12            MS. WILLIAMS:  Sergeant Eiseman, please.
13
14 ROBERT EISEMAN, Sworn
15 Direct-Examination
16 By Ms. Williams
17
18    Q.  Good afternoon.
19    A.  Good afternoon.
20    Q.  Would you tell us your full name, please?
21    A.  My name is Robert Eiseman.
22    Q.  Where do you work, sir?
23    A.  I work for the Commonwealth, at the State Police
24 Barracks in Norwell.

176

1   Q. And are you a State Police officer?

2   A. Yes, I am.

3   Q. How long have you been a State Police Officer?

4   A. Eighteen years.

5   Q. What is your rank?

6   A. Sergeant.

7   Q. Sergeant Eiseman, I'd like to ask you whether you were working out of the Norwell Barracks and assigned to the Norwell Barracks in October, 1996?

10  A. Yes, I was.

11  Q. On October 10, 1996, did you have occasion to go to the scene of a collision at the Plymouth Quarries in Hingham?

14  A. Yes, I did.

15  Q. About how long after the collision did you arrive?

17  A. I arrived there, I'd say, approximately forty minutes after the collision.

19  Q. When you arrived, was Michael Subenko still there?

21  A. No, he wasn't.

22  Q. All right. Had he been taken by helicopter?

23  A. He had been transported somewhere for medical attention.